## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

PATRICK DUNN,         )
                             )
       **Plaintiff,**       )
                             )         **CIVIL ACTION NO.**
v.                   )
                             )
                             )
EARTHBOUND       )         _____
HOLDING, LLC      )
                             )
       **Defendant.**      )
                             )

## COMPLAINT

## I.    INTRODUCTION

COMES NOW Plaintiff, PATRICK DUNN (hereinafter referred to as "Plaintiff"), by and through the undersigned counsel, and files this Title III, Americans with Disabilities Act (hereinafter referred to as the "ADA") action seeking injunctive relief, attorney's fees and costs. 42 U.S.C. §12181 *et seq.* (2018). In Count One of the Complaint, Plaintiff seeks to enjoin Defendant EARTHBOUND HOLDING, LLC, D/B/A EARTHBOUND TRADING CO. (hereinafter referred to as the "Defendant") to remove architectural barriers. In Count Two of the Complaint, Plaintiff seeks to enjoin Defendant to maintain practices, policies, and procedures necessary to maintain the premises free of architectural barriers both now and once the barriers are removed. In Count Three of the Complaint, Plaintiff seeks to enjoin

1

the Defendant's use of the premises to provide full and equal enjoyment of the premises to the disabled. Counts Two and Three of the Complaint seek independent relief in addition to the removal of architectural barriers. Count Four of the Complaint seeks to enjoin Defendant's failure to design and construct the facilities to the ADA compliance. In Count Five of the Complaint, Plaintiff seeks to enjoin Defendant's failure to take necessary steps to ensure Plaintiff is not denied services, segregated, or otherwise treated differently than individuals who do not have disabilities through the use of the services offered on www.earthboundtrading.com. In Count Six of the Complaint, Plaintiff seeks to enjoin Defendant to remediate the application of its website which fails to integrate an accessible platform usable by disabled individuals.

## JURISDICTION, VENUE, PARTIES AND ARTICLE III STANDING

1. Because this is an action for declaratory and injunctive relief pursuant to Title III of the ADA, 42 U.S.C. §12181, *et seq*., and its implementing regulations, this Court is vested with original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this Court, the United States District Court for the Northern District of Florida, pursuant to 28 U.S.C. §1391 and the Local Rules of the United States District Court for the Northern District of Florida.

2

3. Plaintiff is a resident and a citizen of the Middle District of Alabama. On March 8, 2001, as a result of an automobile accident, he sustained permanent damage to his C-7 vertebra in the spinal cord. Plaintiff became paralyzed, which has permanently confined him to a wheelchair and restricted his ability to use his hands, arms and legs. Therefore, Plaintiff is disabled pursuant to the ADA, in that he suffers a physical impairment substantially limiting one or more major life activities. 42 U.S.C. § 12102; 28 C.F.R. § 36.104.

4. Defendant, Earthbound Holding, LLC, (hereinafter referred to as the "Defendant"), is a limited liability company that is both registered to conduct business and is conducting business within the State of Florida sufficient to create both general and specific jurisdiction. Publicly available information provides Defendant operates and leases the facilities located at 4119 Legendary Drive, Suite F-106B, Destin, Florida 32541 (hereinafter referred to as "Destin Location") and 5100 N. 9th Avenue, Pensacola, Florida 32504 (hereinafter referred to as "Pensacola Location"), which are the retail stores known as Earthbound Trading Co. *See* 42 U.S.C. § 12182(a). The retail stores are the commercial facilities in that they are intended for nonresidential use and affect commerce. 42 U.S.C. § 12181(2)(A). Defendant claims its

facilities are places where one can be true to himself or herself, invites to its community of free spirits, curious souls and adventurous nomads. The establishments offer unique merchandise ranging from bohemian fashion of bold prints and comfortable fits in their clothing items including but not limited to unisex tunics, floral print flare pants, shorts, tribal print shirts; to eclectic gifts and colorful home décor and accessories including tapestry, blankets, wall décor, sunglasses, necklaces, bracelets, watches, other jewelry, etc. to the public, encouraging personal style for nomadic spirit and embracing individuality and cravings of exploration, igniting adventure and celebrating diversity. Accordingly, Defendant's retail stores qualify as places of public accommodation. 42 U.S.C. § 12181(7).

5.   Upon information and belief, Defendant "owns" the public internet website www.earthboundtrading.com and the goods and services offered on the world-wide website services that are available to the public at Earthbound Trading Co. It is, therefore, responsible for creating, implementing, and maintaining policies, practices and procedures, and further, providing auxiliary aids and services to its web-based services. 42 U.S.C. § 12182. Consistent with the text and legislative history of the ADA, the Department of Justice (hereinafter referred to as the "Department") has

4

long affirmed the application of Title III of the ADA to websites of public accommodations. Legislative history also supports that websites of public accommodations are covered under Title III. Congress' purpose in enacting the ADA was "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," having found that "discrimination against individuals with disabilities persists in such critical areas as . . . public accommodations . . ." and that "many people with physical or mental disabilities have been precluded from [fully participating in all aspects of society]." 42 U.S.C. §§ 12101(a)(1) and (3); § 12101(b)(1). Although the internet did not exist when Congress enacted the ADA in 1990, Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations. Consequently, it is consistent with Congressional intent to include within Title III coverage of the goods and services provided by public accommodations over their websites. *See Gil v. Winn Dixie Stores, Inc.,* 242 F.Supp.39 1315, 1321 (S.D. Fla. 2017); *see also Nat'l Fed'n of the Blind v. Scribd*, 97 F.Supp. 3d 565, 574 (D. Vt. 2015).

6. Substantially all the events or omissions occurred, and the real properties in question are located in the Northern District of Florida. 42

U.S.C. § 1391(b)(2).

7.   Plaintiff visits Destin, Florida, which is a popular vacation and entertainment destination, at least two or three times a year. He resides in Andalusia, Alabama, which is approximately seventy-eight (78) miles from Destin, Florida. Plaintiff is a frequent visitor of the location because he enjoys the different types of entertainment it has to offer. Plaintiff enjoys the social activities and entertainment whether it is the beach, shopping, dining, sightseeing, socializing with friends and family or resort activities. At least once a year Plaintiff visits Destin Commons Ltd shopping center, which provides open-air shopping experience, exceptional shopping atmosphere, unique retailers, various tourist entertainment and diverse dining options, and where Defendant operates its Destin Location store, and which is the subject of this litigation. Plaintiff will not only return to shop at Earthbound Trading Co. at Destin Commons shopping center within the next couple of months, but also to confirm compliance with the ADA by the Defendant. Plaintiff does not know exactly when he will go back to the Defendant's retail store because he has not planned every trip for the rest of his life. A specific planning is not necessary to invoke the ADA as such visitation may occur at the spur of the moment. *Segal v. Rickey's Restaurant and*

*Lounge, Inc*., No. 11-61766-cn (S.D. Fla. Apr. 25, 2012); s*ee Parr v. L & L Drive Inn Rest.*, 96 F. Supp.2d 1065, 1079 (D. Haw. 2000). Plaintiff will visit Destin, Florida not only to socialize, shop and eat, but also to verify Earthbound Trading Co. repairs its facilities and addresses its non-compliant practices to become ADA compliant and will continue to do so in the future to ensure Defendant maintains its store to accessibility standards.

8.  Plaintiff visits Pensacola, Florida, which is a popular vacation and entertainment destination, at least two or three times a year. He resides in Andalusia, Alabama, which is approximately eighty-five (85) miles from Pensacola, Florida. Plaintiff is a frequent visitor of the location because he enjoys the different types of entertainment it has to offer. Plaintiff enjoys the social activities and entertainment whether it is the beach, shopping, sightseeing, socializing with family and friends or resort activities. At least once a year Plaintiff visits Cordova Mall shopping center, which provides outstanding shopping experience, exceptional shopping atmosphere, unique retailers, various tourist entertainment and diverse dining options, and where Defendant operates Pensacola Location retail store, which is the subject of this litigation. Plaintiff will not only return to shop at Earthbound Trading

Co. at Cordova Mall shopping center within the next few months, but also to confirm compliance with the ADA by the Defendant. Plaintiff does not know exactly when he will go back to the Defendant's retail store because he has not planned every trip for the rest of his life. A specific planning is not necessary to invoke the ADA as such visitation may occur at the spur of the moment. *Segal v. Rickey's Restaurant and Lounge, Inc*., No. 11-61766-cn (S.D. Fla. Apr. 25, 2012); s*ee Parr v. L & L Drive Inn Rest.*, 96 F. Supp.2d 1065, 1079 (D. Haw. 2000). Plaintiff will visit Pensacola, Florida not only to socialize, shop and eat, but also to verify Earthbound Trading Co. repairs its non-compliant facilities to become ADA compliant and will continue to do so in the future to ensure Defendant maintains its store to accessibility standards.

9. Because of the barriers described in paragraphs 24-25 and throughout this Complaint, Plaintiff has been denied full and equal enjoyment of the Defendant's facilities on the basis of his disability.

10. Accordingly, Plaintiff has Article III standing to pursue this case because (1) he is a qualified disabled individual pursuant to the statutory and regulatory definition; (2) Defendant's establishments are places of public accommodation pursuant to their statutory and regulatory definition; (3) Plaintiff suffered a concrete and particularized injury by

being denied access to the establishment by architectural barriers, by being denied access by the Defendant's practices and procedures described throughout this Complaint, and by Defendant's denial of the use of the establishment for his full and equal enjoyment as the able-bodied individuals, as described throughout this Complaint, and (4) because of these injuries there exists a genuine threat of imminent future injury as described in paragraph 22 and throughout this Complaint.

## II.    PLAINTIFF'S CLAIMS
### ADA, Title III

**11.** On or about July 26, 1990, Congress enacted Title III of the ADA, 42 U.S.C. §12181 *et seq*. Commercial enterprises were provided one and a half years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992. 42 U.S.C. §12181; 20 C.F.R. §36.508(A); *see* § 36.304.

**12.** Pursuant to the ADA, the Defendant's establishments are places of public accommodation in that they are retail stores offering unique merchandise of bold prints and comfortable fits in their clothing items including but not limited to unisex tunics, floral print flare pants, shorts, tribal print shirts; as well as colorful home décor and accessories including tapestry, blankets, wall décor, sunglasses, necklaces,

9

bracelets, watches, other jewelry and gifts, etc. to the public, encouraging personal style for nomadic spirit and embracing individuality and cravings of exploration, igniting adventure and celebrating diversity.  42 U.S.C. § 12181(7); 28 C.F.R. § 36.104. Accordingly, they are covered by the ADA and must comply with the Act.

## COUNT ONE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(iv)
### *(Architectural Barriers)*

### Defendant's Facilities Are Subject to the 2010 ADA Design Standards for the Portions of the Facilities Addressed in this Complaint

**13.** Upon information and belief based on publicly available information, the establishment in which the Earthbound Trading Co. retail store is located in Destin Location was first constructed into the Earthbound Trading Co. in 2011.

**14.** Upon further information and belief based on publicly available information, alterations and/or improvements were made to the retail store in its Destin Location as recently as in 2017.

**15.** Upon information and belief based on publicly available information, the establishment in which the Earthbound Trading Co. retail store located in Pensacola Location was first constructed into the Earthbound

Trading Co. in 2008.

16. Upon further information and belief based on publicly available information, alterations and/or improvements were made to the retail store in its Pensacola Location after 2008.

17. The ADA was enacted requiring that facilities constructed prior to January 26, 1992, are considered an existing facility, such that those facilities must remove architectural barriers where such removal is readily achievable. 42 U.S.C. § 12182(b)(2)(A)(iv). All alterations made to existing facilities after January 26, 1992, and all new construction after January 26, 1993, must be readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs. 42 U.S.C. § 12183(a); (b). 28 C.F.R. § 36.402. "Readily accessible to and usable by. . ." is the new construction standard, which requires compliance with the Department of Justice standards. 42 U.S.C. § 12183(a)(1); 28 C.F.R. § 36.406. The only defense for failing to provide readily accessible and usable buildings constructed under the new construction standards is if the design and construction of the building to be readily accessible and usable is structurally impracticable. 42 U.S.C. § 12183(a)(1). The structural impracticability defense applies only in rare circumstances of extraordinary terrain. 28 C.F.R. §

36.401(c). "Readily accessible to and usable by. . ." is also the alterations standard. 42 U.S.C. § 12183(a)(2). An alteration is a change to a place of public accommodation or commercial facility that affects or could affect the usability of the facility or any part thereof. 28 C.F.R. § 36.402(b).

18. New construction and alterations must comply with either the Justice Department's 1991 Standards for Accessible Design, or the 2010 Standards for Accessible Design.   The Department's regulations establish whether the 1991 Standards for Accessible Design or 2010 Standards for Accessible Design apply as follows: new construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 1991 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is before September 15, 2010, or if no permit is required, if the start of physical construction or alterations occurs before September 15, 2010. 28 C.F.R. § 36.406(a)(1). New construction and alterations subject to §§ 36.401 or 36.402 shall comply either with the 1991 Standards or with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after

September 15, 2010, and before March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after September 15, 2010, and before March 15, 2012. 28 C.F.R. § 36.406(a)(2). New construction and alterations subject to §§ 36.401 or 36.402 shall comply with the 2010 Standards if the date when the last application for a building permit or permit extension is certified to be complete by a State, county, or local government is on or after March 15, 2012, or if no permit is required, if the start of physical construction or alterations occurs on or after March 15, 2012. Where the facility does not comply with the 1991 Standards, the 2010 Standards are applicable. *See* 28 C.F.R. § 36.406(5)(ii) (stating "Newly constructed or altered facilities or elements covered by §§ 36.401 or 36.402 that were constructed or altered before March 15, 2012 and that do not comply with the 1991 Standards shall, on or after March 15, 2012, be made accessible in accordance with the 2010 Standards.")

19. For the architectural barriers at issue in this case, the 2010 Standards for Accessible Design are applicable to Destin Location and to Pensacola Location.

**Plaintiff's Concrete and Particularized Standing to Pursue an Injunction**

20. Defendant has discriminated and continues to discriminate, against

13

Plaintiff and others who are similarly situated by denying full and equal access to and full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations at Earthbound Trading Co. in derogation and in violation of Title III of the ADA. 42 U.S.C. §§ 12101 *et seq*., and 12182 *et seq*. As a new construction, the building must be readily accessible to and usable by individuals with disabilities. 42 U.S.C. §§ 12183 (a) and (b). Defendant's failure to remove the existing barriers thus violates Title III of the ADA, which requires removal of architectural barriers. 42 U.S.C. § 12182(b)(2)(A)(iv).

21. As described above, prior to the filing of this lawsuit, Plaintiff was denied full and equal access to all the benefits, accommodations, and services offered to individuals without disabilities within and about the Defendant's facilities. Plaintiff's access was inhibited by each of the described architectural barriers detailed in this Complaint which remain at the establishments in violation of the ADA. Because of the foregoing, Plaintiff has suffered an injury-in-fact in precisely the manner and form that the ADA was enacted to guard against. *Wooden v. Board of Regents of Univ. Sys. Of Geo.,* 247 F. 3d 1262, 1284 (11th Cir. 2001); *Access Now, Inc. v. S. Fla. Stadium Corp.,* 161 F.Supp.2d 1357, 1364 (S. D. Fla. 2012).

**22.** Plaintiff has definite plans to return to shop at Earthbound Trading Co., even though the exact date is undetermined, at Destin Commons Ltd and Cordova Mall shopping centers, as well as to confirm compliance with the ADA by the Defendant and whether the Defendant has remediated its architectural barriers and has changed its practices and procedures. Additionally, of vital importance, the barriers are not just created by the construction issues and design, but rather many are created by human activities, from the way the Defendant's workers at the facilities use the physical architectural elements of the establishment. The barriers created by human activity will need to be reviewed and maintained forever, to be sure Defendant's management and workers continuously act in a manner that does not create barriers. Absent remedial action by the Defendant, Plaintiff will continue to encounter the architectural barriers, and the discriminatory policies, practices, and procedures described herein and as a result, be discriminated against by Defendant on the basis of his disabilities. The Eleventh Circuit held that when architectural barriers have not been remedied, "there is a 100% likelihood that plaintiff . . .will suffer the alleged injury again when he returns to the store." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1336 (11th Cir. 2013). Additionally,

"an alleged constitutional infringement will often alone constitute irreparable harm." *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271—72 (11th Cir. 2006) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (quoting "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Due to the definiteness of Plaintiff's future plans to continue visiting the subject establishment, there exists a genuine threat of imminent future injury.

## Architectural Barriers

23. On July 26, 1991, the Department of Justice, Office of the Attorney General, promulgated Federal Regulations to implement the requirements of the ADA. 42 U.S.C. § 12134(a); 28 C.F.R. Part 36.

24. Plaintiff has been to and throughout the Destin location store from the entrance to and throughout the dressing rooms, the dressing rooms themselves; throughout circulation paths and accessible routes, and service areas, paths of travel, and in particular but not limited to all of which is more specifically described below. Defendant's Destin Location facility violates the ADA in particular but not limited to the following:

16

**A.** Defendant provides an accessible route to and throughout the shopping retail aisles for able-bodied individuals but fails to provide an ADA accessible route to and throughout the retail shopping aisle for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at Defendant's store;

**(1)** Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining at least one accessible route that connects the facility entrance with all accessible spaces and elements within the facility which are otherwise connected by a circulation path;

**(2)** Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the self-

17

service shelves on an accessible route complying with §402;

**(3)** Defendant fails to maintain the retail store aisles accessible route in operable condition by conforming with the ADA Standards for Accessible Design so that the required clear walking surfaces and its associated elements are not rendered unusable by the disabled as a result of the display tables, clothing racks, and, among other, items obstructing the clear floor walking surface;

**(4)** Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the accessible routes clear width at turns and/or passing spaces which has the discriminatory effects of rendering the shopping aisles, including its goods, as unusable by the disabled;

**(5)** Defendant's use of its merchandise display racks is positioned in a way that has a discriminatory effect in

practice of prohibiting individuals with disabilities from being afforded the opportunity to maneuver to and throughout the retail shopping aisles and turning to maneuver throughout the adjacent shopping aisle;

**(6)** Defendant fails to have or otherwise fails to enforce its policies, practices, or procedures on maintaining in operable working condition the features of the purported accessible route to and throughout the retail store shopping aisles so that the goods and services are readily accessible to and usable by individuals with disabilities;

**(7)** Defendant has ineffective policies, practices, or procedures that ensures the purported accessible route is readily accessible to and usable by individuals with disabilities so that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities;

**B.**   Defendant provides sales and service counters for able-bodied individuals to transact business and otherwise receive services that are provided at each counter but fails to afford non-able-

bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

(1) There is not at least one of each type of sales counter and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

(2) There is not at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(3)** There is not  at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36 inch minimum length of counter, or, alternatively, a portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(4)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not

21

limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

(5) There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that accessible counter extends the same depth as the non-accessible portion of the counter;

(6) There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

22

**(7)** Defendant fails to maintain the accessible features of the sales/service counter that are required to be readily accessible to and usable by individuals with disabilities;

**C.** Defendant provides dressing rooms for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the dressing room and its associated elements as unusable by disabled individuals;

**(2)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is

23

maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the required t-shaped and/or circular turning space within the dressing room does not prohibit disabled individuals from maneuvering independently throughout the room;

**(3)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the door swings outwards and/or provides the required 30x48 inches of clear floor space beyond the arc of the door swing;

**(4)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the bench and its associated requirements are not restricting the dressing room's usability by disabled individuals;

    **a.** The dressing room fails to maintain a bench seat in conformance with the ADA Standards for

24

Accessible Design so that a clear floor or ground space is provided and positioned at the end of the bench seat and parallel to the short axis of the bench;

**b.** The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining a seat that is a minimum of 42 inches long and 20 inches deep minimum to 24 inches deep maximum;

**c.** The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to the bench seat being affixed to the wall, or maintaining a back support that is 42 inches long minimum, extending 2 inches maximum above the seat surface

25

to a point 18 inches above the seat surface so that the back support measures a maximum of a 2.5 inches from the rear edge of the seat measured horizontally;

**d.** The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design so that the top of the bench seat surface is 17 inches minimum and 19 inches maximum above the finish floor or ground;

**e.** The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the structural strength of the bench so that when a vertical or horizontal force of 250 pounds is applied at any point on the seat, fastener, mounting device, or supporting structure, the bench is not rendered unusable by the disabled;

**(5)** There is not at least 5%, but no fewer than one, of each

26

type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the coat hook measures the required height for unobstructed and/or obstructed reach ranges;

25. Plaintiff has been to and throughout the Pensacola location store from the entrance to and throughout the dressing rooms, the dressing rooms themselves; throughout circulation paths and accessible routes, and service areas, paths of travel, and in particular but not limited to all of which is more specifically described below. Defendant's Pensacola location facility violates the ADA in particular but not limited to the following:

   A. Defendant provides an accessible route to and throughout the shopping retail aisles for able-bodied individuals but fails to provide an ADA accessible route to and throughout the retail shopping aisle for individuals with disabilities which prohibits individuals with disabilities from the full and equal opportunity to access the goods and services at Defendant's store;

      (1) Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards

for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining at least one accessible route that connects the facility entrance with all accessible spaces and elements within the facility which are otherwise connected by a circulation path;

(2) Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the self-service shelves on an accessible route complying with §402;

(3) Defendant fails to maintain the retail store aisles accessible route in operable condition by conforming with the ADA Standards for Accessible Design so that the required clear walking surfaces and its associated elements are not rendered unusable by the disabled as a result of the display tables, clothing racks, and, among other, items obstructing the clear floor walking surface;

28

**(4)** Defendant fails to maintain the retail store aisles accessible route in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the accessible routes' clear width at turns and/or passing spaces which has the discriminatory effects of rendering the shopping aisles, including its goods, as unusable by the disabled;

**(5)** Defendant's use of its merchandise display racks is positioned in a way that has a discriminatory effect in practice of prohibiting individuals with disabilities from being afforded the opportunity to maneuver to and throughout the retail shopping aisles and turning to maneuver throughout the adjacent shopping aisle;

**(6)** Defendant fails to have or otherwise fails to enforce its policies, practices, or procedures on maintaining in operable working condition the features of the purported accessible route to and throughout the retail store shopping

aisles so that the goods and services are readily accessible to and usable by individuals with disabilities;

**(7)** Defendant has ineffective policies, practices, or procedures that ensure the purported accessible route is readily accessible to and usable by individuals with disabilities so that no individual with a disability is excluded, denied services, segregated, or otherwise treated differently than other individuals without disabilities;

**B.** Defendant provides sales and service counters for able-bodied individuals to transact business and otherwise receive services that are provided at each counter but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities, which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least one of each type of sales counter and service counter that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that

30

are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the counter, its associated elements, and services offered at the counter as unusable by disabled individuals;

**(2)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the accessible counter and its associated elements are located adjacent to a walking surface complying with 403;

**(3)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that a portion of the counter surface that is 36 inches long minimum and 36 inches high maximum above the finish floor is readily usable by disabled individuals which includes maintaining a clear floor or ground space complying with 305 positioned for either a parallel approach adjacent to the 36-inch minimum length of

counter, or, alternatively, A portion of the counter surface that is 30 inches long minimum and 36 inches high maximum with Knee and toe space complying with 306 provided under the counter and a clear floor or ground space complying with 305 positioned for a forward approach to the counter;

**(4)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the clear counter surface free of obstructions or any other clutter that could have the discriminatory effects of rendering the counter and its associated benefits and services as unusable by the disabled;

**(5)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that

accessible counter extends the same depth as the non-accessible portion of the counter;

**(6)** There is not at least one of each type of sales counter and service counter that is maintained in operable condition with the ADA Standards for Accessible Design so that a credit card payment terminal is positioned or otherwise maintained in a readily accessible to and independently usable location at the accessible counter which has the discriminatory effects in practice of affording disabled individuals an unequal opportunity to independently transact business in the same manner as non-disabled individuals;

**(7)** Defendant fails to maintain the accessible features of the sales/service counter that are required to be readily accessible to and usable by individuals with disabilities;

**C.**  Defendant provides dressing rooms for able-bodied individuals, but fails to afford non-able-bodied individuals the same opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is equal to that experience afforded to other individuals without disabilities,

which includes but is not limited to the following failures of Defendant:

**(1)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in conformance with the ADA Standards for Accessible Design in all the ways that are required to be readily accessible to and usable by disabled individuals which has the discriminatory effects of rendering the dressing room and its associated elements as unusable by disabled individuals;

**(2)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the required t-shaped and/or circular turning space within the dressing room does not prohibit disabled individuals from maneuvering independently throughout the room;

**(3)** There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the

34

ADA Standards for Accessible Design so that the door swings outwards and/or provides the required 30x48 inches of clear floor space beyond the arc of the door swing;

(4) There is not at least 5%, but no fewer than one, of each type of the dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the bench and its associated requirements are not restricting the dressing room's usability by disabled individuals;

   a. The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design so that a clear floor or ground space is provided and positioned at the end of the bench seat and parallel to the short axis of the bench;

   b. The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled

35

individuals which includes but is not limited to maintaining a seat that is a minimum of 42 inches long and 20 inches deep minimum to 24 inches deep maximum;

c. The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to the bench seat being affixed to the wall, or maintaining a back support that is 42 inches long minimum, extending 2 inches maximum above the seat surface to a point 18 inches above the seat surface so that the back support measures a maximum of a 2.5 inches from the rear edge of the seat measured horizontally;

d. The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design so that the top of the bench seat

36

surface is 17 inches minimum and 19 inches maximum above the finish floor or ground;

e. The dressing room fails to maintain a bench seat in conformance with the ADA Standards for Accessible Design in all the ways that it is required to be readily accessible to and usable by disabled individuals which includes but is not limited to maintaining the structural strength of the bench so that when a vertical or horizontal force of 250 pounds is applied at any point on the seat, fastener, mounting device, or supporting structure, the bench is not rendered unusable by the disabled;

(5) There is not at least 5%, but no fewer than one, of each type of dressing room in each cluster of rooms that is maintained in operable condition by conforming with the ADA Standards for Accessible Design so that the coat hook measures the required height for unobstructed and/or obstructed reach ranges;

26. To date, the barriers to access and other violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate

37

compliance with the provisions of the ADA.

27. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs, and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

28. Pursuant to 42 U.S.C. § 12188, this Court is vested with the authority to grant Plaintiff's injunctive relief, including an order to alter the discriminating facilities to make them readily accessible to, and usable by, individuals with disabilities to the extent required by the ADA, and closing the facilities until the requisite modifications are completed, and to further order the Defendant to modify its policies, practices, and procedures, to provide equal use of their facilities, services, and benefits to disabled individuals.

## COUNT TWO
## VIOLATION OF AMERICANS WITH DISABILITIES ACT, TITLE III
## 42 U.S.C. § 12182(b)(2)(A)(ii)
### *(Practices, procedures, and policies denying equal benefits)*

### ADA Title III Prohibits Other Discrimination in Addition to Architectural Barriers

29. Plaintiff realleges and reincorporates all the allegations in paragraphs 1 through 28 as fully stated herein.

30. Title III of the ADA provides a private right of action for "any person who is being subjected to discrimination on the basis of disability in violation of Title III." 42 U.S.C. § 12182(a)(1).

31. Title III of the ADA specifically makes it unlawful to provide individuals with disabilities with an unequal benefit and to relegate individuals with disabilities to a different or separate benefit. 42 U.S.C. § 12182(b)(1)(A)(ii), (iii); 28 C.F.R. §§ 36.202(b), (c). In other words, the disabled must receive equal benefits as the nondisabled. Further, 28 C.F.R. § 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs and mobility aids have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs and mobility aids historically have been provided segregated accommodations compared to non-disabled individuals; thus, relegating persons who use wheelchairs "to the status of second-class citizens." *See* Title III ADA Regulations of 1991, pt. 36, App. B, at 631—33, 651 (2000) (current version at 28 C.F.R. §§ 36.308, 36.203).

32. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. § 12101(a)(5).

33. To address this broad range of discrimination in the context of public accommodations, Congress enacted Title III of the ADA, which provides in part, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182.

34. By its clear text, Title III of the ADA requires a public accommodation to provide individuals with disabilities more than simple physical access. Removal of architectural barriers as required by Count One of this Complaint is but one component of compliance with Title III of the

ADA. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. § 12101(a)(5); *see* H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35—36 (1990) (stating "lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); *see also* H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and activities conducted by the public accommodation").

35. For that reason, the Act applies not only to barriers to physical access to places of public accommodation, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. § 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(2)(A)(ii). Further, the Eleventh Circuit held that:

A reading of the plain and unambiguous statutory

41

language at issue reveals that the definition of discrimination provided in Title III covers both tangible barriers, that is, physical and architectural barriers that would prevent a disabled person from entering an accommodation's facilities and accessing its goods, services and privileges, see 42 U.S.C. § 12182(b)(2)(A)(iv), and intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges.

*Rendon v. Valleycrest Prod., Ltd.,* 294 F.3d 1279 (11th Cir. 2002).

## **Defendant's Failed Practices and Lack of Policies are Discriminatory**

36. Further, discrimination includes:

[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

37. Accordingly, a place of public accommodation must modify a policy or practice that has the consequence of, or tends to deny, access to goods or services to the disabled. Similarly, a place of public accommodation must not have a policy or practice that "has a discriminatory effect in

practice" of preventing disabled individuals from realizing the full and equal enjoyment of the goods and services the public accommodation offers to potential customers. *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F.Supp.3d 565 (D. Vt. 2015).

38. As detailed below, Defendant has failed to make reasonable modifications in their policies, practices, and procedures that are necessary to afford their goods, services, facilities, privileges, advantages, or accommodations to individuals with restricted mobility. By failing to take such efforts that may be necessary to ensure that no individual with a disability is excluded, Defendant denied services, segregated or otherwise treated Plaintiff differently than other individuals who are not disabled. Defendant has discriminated against Plaintiff. 42 U.S.C. § 12182(b)(2)(A). Defendant will continue that discrimination forever until enjoined as Plaintiff requests. The discrimination is described more particularly in the following paragraphs.

39. Defendant either has no policies, practices, and procedures to remove architectural barriers or else does not abide by them. The rampant architectural barriers previously identified in Count One establish that Defendant has failed to create, adopt, and/or implement ADA Title III

compliance policies, procedures, and practices as to architectural barriers.

40. Defendant's use of its retail stores, and their practices at the stores at Destin Location and Pensacola Location, create barriers, and in so doing, denies Plaintiff the full and equal enjoyment of the goods and services at Earthbound Trading Co. Those practices include:

1) Defendant fails to provide an accessible route to and throughout the store, which means Plaintiff cannot travel and move throughout the store the way non-disabled people can. Accordingly, he cannot fully and equally use the store as the non-disabled can;

2) Defendant fails to provide an accessible route to and throughout the shopping retail aisles throughout the store, which means Plaintiff cannot travel and move throughout the shopping retail aisles the way non-disabled people can. Accordingly, he cannot fully and equally use the store as the non-disabled can;

3) Defendant fails to provide accessible dressing rooms to Plaintiff and other disabled individuals, so that Plaintiff cannot try on clothes or move into and throughout the dressing rooms which the able-bodied can freely do;

4) Defendant makes the sales and service counter inaccessible for use by the disabled by failing to provide either a parallel or a forward approach to the counter, which means Plaintiff cannot fully and equally use the counter to receive services and check out in the way the non-disabled do, because the non-disabled have counters they can use to checkout;

5) Point of sale machines are located so as to be inaccessible, denying Plaintiff the ability to equally use those machines as the non-disabled, who can independently use the point of sale machines to pay for their purchases, though he cannot;

6) Defendant fails to provide informational signage throughout the store that displays the International Symbol of Accessibility and otherwise informs and directs disabled individuals to the ADA accessible elements within the store, which means that Defendant does not even claim to have any ADA accessible elements within the store and that Plaintiff is forced to use trial and error to decide which elements within the store he can use, if he can use any at all, unlike the non-disabled who can freely use all of the elements within the store;

7) Defendant's practices are conducted without regard to disabled

individuals.

41. The continuing architectural barriers and the failure to provide full and equal use of the facility establish that Defendant has no policies, practices, and procedures or else it failed to create, implement, and maintain policies and procedures to ensure individuals with disabilities are able to have the same experience at their retail store as individuals without disabilities, and in particular the opportunity to have full and equal access to all of the goods, services, privileges, advantages, or accommodations of the Defendant's Destin and Pensacola Locations, as described above in detail. 42 U.S.C. § 12182(b)(1)(A).

42. The continuing architectural barriers and the failure to provide full and equal use of the facility establish that Defendant has failed to create, implement, and maintain a policy of complying with ADA building design standards and regulations.

43. To date, the Defendant's discriminating policies, practices and procedures have not been reasonably modified to afford goods, services, facilities, privileges, advantages, or other accommodations to individuals with disabilities.

44. A reasonable modification in the policies, practices, and procedures described above will not fundamentally alter the nature of such goods,

services, facilities, privileges, advantages, and accommodations. Plaintiff hereby demands that Defendant both creates and adopts a corporate practice and policy that Defendant (1) will fully comply with the Title III of the ADA and all its implementing regulations so that architectural barriers identified above are permanently removed from Defendant's retail stores consistent with the ADA; (2) Defendant will provide the disabled, including those with mobility limitations, full and equal use and enjoyment of the Defendant's retail stores at Destin and Pensacola Locations; (3) Defendant will modify its practice of making the ADA Title III architectural barrier remediations only upon demand by the disabled.

45. As pled above, Defendant "operates" and "leases" the Earthbound Trading Co. retail stores both at Destin Location and Pensacola Location, and is, therefore, responsible for creating, implementing, and maintaining policies, practices, and procedures, as alleged above. *See* 42 U.S.C. § 12182.

46. The ADA is over twenty-five (25) years old. Defendant knows it must comply with the Title III of the ADA, which requires modifications in policies, practices, and procedures to comply with it, as pled above. 42 U.S.C. § 12182(b)(2)(A)(ii).

**47.** By this Complaint, Plaintiff provides sufficient notice of his demands for an alteration in Defendant's policies, practices, and procedures.

**48.** Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs, and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

**49.** Pursuant to 42 U.S.C. § 12188, this Court is authorized to enjoin these illegal policies, practices, and procedures.

**COUNT THREE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
*(Denial of Full and Equal Enjoyment)*

**50.** Plaintiff realleges and reincorporates paragraphs 1 through 49 as fully stated herein.

**51.** 42 U.S.C. § 12182(a) provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

**52.** Congress enacted the ADA upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a

"serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

53. Congress also found that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities, 42 U.S.C. § 12101(a)(5); "the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(7). Congress found that, "[*T]he continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity.*"42 U.S.C. § 12101(a)(8) (emphasis added).

54. In response to these findings, Congress explicitly stated that the purpose

of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressed discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1), (2).

55. The ADA provides, *inter alia*, that it is discriminatory to subject an individual or class of individuals on the basis of a disability "to a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity." 42 U.S.C. § 12182(a)(i).

56. The ADA further provides that it is discriminatory "to afford an individual or class of individuals, on the basis of a disability . . . with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(a)(ii).

57. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to

existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." 42 U.S.C. 12101(a)(5). Defendant's acts and omissions alleged herein are in violation of the ADA, and the regulations promulgated thereunder. 42 U.S.C. §§ 12101, *et seq*.

58. To address this broad range of discrimination in the context of public accommodations, Congress enacted Title III, which by its clear text, requires a public accommodation to provide individuals with disabilities more than simple physical access. Congress recognized that "individuals with disabilities continually encounter various forms of discrimination" including not only barriers to physical access, but also other forms of exclusion and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities. 42 U.S.C. § 12101(a)(5); *see* H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess. 35—36 (1990) (stating "lack of physical access to facilities" was only one of several "major areas of discrimination that need to be addressed"); *see also* H.R. Rep. No. 485, Pt. 3, 101st Cong., 2d Sess. 54 (1990) ("It is not sufficient to only make facilities accessible and usable; this title prohibits, as well, discrimination in the provision of programs and

activities conducted by the public accommodation").

59. For that reason, the Act applies not only to barriers to physical access to business locations, but also to any policy, practice, or procedure that operates to deprive or diminish disabled individuals' full and equal enjoyment of the privileges and services offered by the public accommodation to the public. 42 U.S.C. 12182. Thus, a public accommodation may not have a policy, practice or procedure that excludes individuals with disabilities from services. 42 U.S.C. § 12182(b)(1)(A)(i).

60. The keystone for this analysis is that defendants must start by considering how their facilities are used by non-disabled guests and then take reasonable steps to provide disabled guests with a like experience. *Spector v. Norwegian Cruise Line Ltd.*, 125 S. Ct. 2169 (2005); *see Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1135 (9th Cir. 2012).

61. Plaintiff was denied full and equal access to the Defendant's retail stores in Destin and Pensacola Locations, which offer unique merchandise of bold prints and comfortable fits in their clothing items, home décor and accessories including but not limited to unisex tunics, floral print flare pants, shorts, tribal print shirts, colorful sunglasses, necklaces,

bracelets, other jewelry and gifts, etc. to the public, encouraging personal style for nomadic spirit and embracing individuality and cravings of exploration, igniting adventure and celebrating diversity. More specifically, Plaintiff desires to be afforded the same level of service that is offered to non-disabled individuals and which Defendant has failed to provide to Plaintiff in both Destin and Pensacola Locations as follows: Defendant failed to provide an accessible route to and throughout the shopping retail aisles for disabled individuals which means that unlike the non-disabled, the disabled must struggle just to get throughout the retail aisles independently, if they can make it at all; Defendant failed to provide Plaintiff that same experience that non-disabled individuals have when shopping at Earthbound Trading Co. stores; Defendants failed to provide equal experience by making it nearly impossible for the disabled to access the checkout counters, while the non-disabled can independently access the counters and the services provided at the counters; Defendant failed to maintain the accessible signage of Earthbound Trading Co. so that the disabled, unlike the non-disabled, do not even know what route and what facilities are usable by individuals with disabilities; Defendant's failure to identify by signage what is accessible and what is not accessible creates an inferior

experience for the disabled, because unlike the non-disabled, disabled individuals have to guess and speculate and determine by trial and error what facilities can even be used by them; Defendant failed to maintain dressing rooms readily accessible to and usable by Plaintiff and other disabled individuals; and all the foregoing failures by the Defendant inhibited Plaintiff from having the same experience that non-disabled individuals have when at Earthbound Trading Co. Destin and Pensacola Locations.

62. In its Preamble to the Title III regulation, the Department of Justice recognized that mobility impaired persons, including persons in wheelchairs, should have the same opportunities to enjoy the goods and services and other similar events of public accommodation with their families and friends, just as other non-disabled individuals do. The DOJ further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of second-class citizens. 28 C.F.R. pt. 36, App. B, § 36.203 (1991).

63. The ADA specifically makes it unlawful to provide individuals with disabilities with an unequal benefit, and to relegate individuals with disabilities to a different or separate benefit. 42 U.S.C. §§ 12182(b)(1)(A)(ii), (iii); 28 C.F.R. §§ 36.202(b), (c). Further, 28 C.F.R.

§ 302(b) requires that goods, services, and accommodations be provided to individuals with disabilities in "the most integrated setting appropriate." 42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a). Similarly, the Preamble in addition to recognizing that persons who use wheelchairs have been forced to sit apart from family and friends, also recognizes that persons who use wheelchairs historically have been provided inferior seating and segregated accommodations compared to non-disabled individuals, thus relegating persons who use wheelchairs "to the status of second-class citizens." *See* 28 C.F.R. pt. 36, App. B, at 631—33, 651 (2000) (discussing §§ 36.308, 36.203).

64. Thus, Defendant's use of the accessible features constitutes statutory discrimination in violation of the ADA, because Defendant has segregated and separated the disabled from the non-disabled individuals. "The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." H.R. Rep. No. 101—485(III), at 50, 1990 U.S.C.C.A.N. at 473. The ADA provides a broad mandate to eliminate discrimination against disabled individuals, and to integrate those individuals into the economic and social mainstream American life. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (discussing H.R. Rep. No. 101—485,

pt. 2, p.50 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 332).

65. Defendant discriminated against Plaintiff by denying Plaintiff the full and equal enjoyment and use of the goods, services, facilities, privileges and accommodations of the facilities during each visit. Each incident of deterrence denied Plaintiff an equal "opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations" of Earthbound Trading Co. both Destin and Pensacola Locations.

66. Defendant's conduct and Defendant's unequal treatment of Plaintiff constitutes continuous violations of the ADA, and absent a Court ordered injunction from doing so, Defendant will continue to treat Plaintiff and others similarly situated unequally.

67. Defendant's failure to maintain the accessible features that are required to be readily accessible to and usable by individuals with disabilities constitutes continuous discrimination, and absent a Court ordered injunction, Defendant will continue to fail to maintain the required accessible features at Defendant's facilities. 28 C.F.R. § 36.211(a).

68. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs, and expenses paid by the Defendant. 42 U.S.C. §

12205.

69. Further, this Court is authorized to enjoin these illegal acts of Defendant. 42 U.S.C. § 12188.

### COUNT FOUR
### VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
### 42 U.S.C. § 12183(A)(1)
### (Failure to design and construct facilities for ADA compliance)

70. Plaintiff realleges and reincorporates paragraphs 1 through 69 as fully stated herein.

71. 42 U.S.C. § 12183(a)(1) provides

> [Discrimination includes] a failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter.

72. Congress passed the ADA in part because "historically, society has tended to isolate and segregate individuals with disabilities, and such forms of discrimination . . . continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Congress found that this discrimination included "segregation and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." *Id.* §

12101(a)(5). In its Preamble to the Title III regulation, the Department of Justice recognized that persons in wheelchairs should have equal opportunities to enjoy the goods and services and other similar events of a public accommodation with their families and friends, just as other non-disabled individuals do. The Department of Justice further recognized that providing segregated accommodations and services relegates persons with disabilities to the status of second-class citizens. 28 C.F.R. pt. 36, App. B, § 36.203.

73. To eliminate such segregation, Congress enacted the requirement that facilities be "readily accessible to and usable by individuals with disabilities." This very requirement is intended to enable persons with disabilities "to get to, enter and use a facility." H.R. Rep. No. 101—485(III), at 499—500 (1990). It requires "a high degree of convenient accessibility," as well as access to the same services that are provided to members of the general public. "For new construction and alterations, the purpose is to ensure that the service offered to persons with disabilities is equal to the service offered to others." *Id*.

74. As the legislative history makes clear, the ADA is geared to the future, the goal being that, over time, access will be the rule rather than the exception. Thus, the ADA only requires modest expenditures to provide

access in existing facilities, while requiring all new construction to be accessible. H.R. Rep. 485, Part 3, 101st Cong., 2d Sess. 63 (1990).

75. To realize its goal of a fully accessible future, Congress required that all newly constructed facilities be designed and constructed according to architectural standards set by the Attorney General. 42 U.S.C. §§ 12183(a), 12186(b). Those Standards for Accessible Design (hereinafter referred to as "Standards") are incorporated into the Department of Justice's regulation implementing Title III of the ADA, 28 C.F.R. Part 36, App.

76. The Standards set architectural requirements for newly constructed buildings that apply to all areas of the facilities, from parking areas, interior walkways and entrances, common areas, interior stairways and elevators, restrooms, dressing rooms and sales and service areas.

77. Defendant, as the "operator" of the Earthbound Trading Co. retail stores and a "lessee" of the tenant spaces at both Destin and Pensacola Locations, is directly involved in the designing and/or construction of its stores in this litigation for first occupancy after 2011 in Destin Location and after 2008 in Pensacola Location.

78. Defendant was and is required to design and construct the Earthbound Trading Co. retail stores in both Destin and Pensacola Locations to be

"readily accessible to and usable by individuals with disabilities." Defendant violated the statute by failing to design and construct its retail stores to be readily accessible to and usable by individuals with disabilities including individuals who use wheelchairs. Defendant further violated the statute by failing to design and construct its retail stores in compliance with the ADA during planned alterations as described throughout this Complaint.

79. According to Defendant's own publicly available information, Defendant chooses to design its retail stores in a way that is not Title III ADA compliant whatsoever. Defendant's systematic design of its stores fails to afford disabled individuals equal shopping experience that is afforded to individuals without disabilities.

80. To date, the Defendant's discriminating actions continue.

81. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs, and expenses paid by the Defendant. 42 U.S.C. § 12205.

82. This Court is authorized to enjoin these illegal actions of the Defendant. 42 U.S.C. § 12188.

**COUNT FIVE**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**
*(Failure to Provide Website Accessibility)*

83. Plaintiff realleges and reincorporates paragraphs 1 through 82 as fully stated herein.

84. The ADA's legislative history provides that integration is fundamental to the purposes of the ADA. Provision of segregated accommodations, goods and services relegate persons with disabilities to be an inferior second-class citizen. H. Rep. 101—485(III), 101st Cong., *1279 2d Sess., at 56, reprinted in 1990 U.S.C.C.A.N. 445, 479. "The goal is to eradicate the invisibility of the handicapped. Separate-but-equal services do not accomplish this central goal and should be rejected." *Id.* at 50, 1990 U.S.C.C.A.N. at 473.

85. Congress enacted the ADA in light of its findings that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."   42  U.S.C.  §

12101(a)(5).

86. Legislative history indicates that websites of public accommodations are covered by Title III. Although the internet did not exist when Congress enacted the ADA in 1990, the legislative histories state that Congress intended to include the use of new and evolving technologies by public accommodations and other covered entities in meeting their ADA obligations. *Nat'l Assoc. of the Deaf v. Netflix,* 869 F. Supp. 2d 196, 200 (D. Mass. 2012). Consequently, it is consistent with Congressional intent to include within Title III coverage the goods and services provided by public accommodations through their websites. *See Nat'l Fed'n of the Blind v. Scribd*, 97 F. Supp. 3d 565, 574 (D. Vt. 2015).

87. The Department of Justice has long affirmed the application of Title III to the websites of public accommodations. "The statute's broad and expansive nondiscrimination mandate reaches goods and services provided by covered entities on Web sites over the Internet." 75 Fed. Reg. 43,460, 46,463; *see Nat'l Assoc. of the Deaf v. Netflix,* 869 F. Supp. 2d at 200.

88. Today, internet technology enables individuals to participate actively in their community and engage in virtually all forms of commerce from

the comfort and convenience of their home, to the extent that virtual reality through the internet is almost as important as physical reality in brick-and-mortar constructed public accommodations, in pursuing commerce from public accommodations. The fact that websites were not explicitly written into the ADA at its passage in the early 1990s, but are nevertheless covered, does not indicate ambiguity in the ADA, but rather the breadth of the ADA. *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 395 (E.D.N.Y. Aug. 2017); *Nat'l Assoc. of the Deaf v. Netflix,* 869 F. Supp. 2d at 200.

89. The Eleventh Circuit has not yet ruled on whether a website in and of itself is a public accommodation. Nevertheless, the district courts within the Eleventh Circuit have consistently held that a website is required to comply with the ADA if the services provided by the website have a sufficient nexus between the website and a physical store. In other words, the websites services are governed by the ADA just like all other services of a public accommodation are governed by the ADA. In this case, there is sufficient physical nexus between the services provided by the website and physical stores so that the website and its services are governed by the ADA.

90. Although the issue of the websites as a place of public accommodation

is relatively new in the Eleventh Circuit, the District Courts within the

Eleventh Circuit repeatedly held that the ADA applies to a website of a

place of public accommodation if there is a nexus between the website

to a physical location. *Gil v. Winn Dixie Stores, Inc.,* 242 F. Supp. 3d

1315, 1319 (S.D. Fla. 2017); *Access Now, Inc. v. Southwest Airlines,*

*Co.,* 227 F. Supp.2d 1312, 1321 (S.D. Fla. 2002); *Gomez v. Bang &*

*Olufsen Am., Inc.,* No. 16-23801, at 8, WL 1957182 (S.D. Fla. Feb 2,

2017). The Eleventh Circuit found that the statutory language of the

ADA "applies to the services *of* a place of public accommodation, not

services *in* a place of public accommodation," thus concluding that the

store's website was heavily integrated with the brick-and-mortar stores

and operate[d] as a gateway to the stores." *Gil v. Winn Dixie Stores,*

*Inc.,* 242 F. Supp. 3d at 1321 (citing *Nat's Fed'n of the Blind v. Target*

*Corp.,* 452 F. Supp. 2d 946, 949 (N.D. Cal. 2006)).

91. Defendant failed to provide Plaintiff with the website in the same

manner as individuals without disabilities, because the website fails to

integrate alternative platforms that enable disabled individuals who

have limited use of their hands the opportunity to use the alternative

platforms to navigate and select items on the page. An able-bodied

online website user can use a mouse to navigate, whereas Plaintiff, who

has limited use of his hands, cannot use assistive technology to navigate through the website. Specifically, Mr. Dunn is unable to use the website to use the website by either voice or keyboard access, which would permit him to use the website and its services as the able-bodied do. Moreover, Defendant provides a plethora of services and associated benefits, including but not limited to: gift card purchases that can be used in physical stores, store locators, access to coupons and other available discounts usable in physical stores, order status checker for delivery of goods that can be picked up at the physical store, among other services to able-bodied individuals, but fails to provide the same services to disabled individuals which relegates and otherwise segregates Plaintiff and disabled individuals to inferior benefits and services of Earthbound Trading Co.

92. The design of Defendant's website impedes Plaintiff and others similarly situated from accessing the services, privileges and accommodations afforded to able-bodied patrons through the web platform. The website fails to integrate alternative access methods that allow a person with limited manual dexterity to access the information and navigate the website without being able to use a mouse. *That is, the website design does not provide for functions to be carried out using a*

*keyboard or voice input.* Such actions relegate and otherwise segregate persons with disabilities to inferior benefits and services offered by the Defendant.

93. Plaintiff desires to be afforded equal level of service that is offered to the able-bodied individuals. Unlike the able-bodied individuals, Plaintiff cannot access Defendant's website independently.

94. As pled previously, intangible barriers to access are prohibited, just as tangible barriers are prohibited. *Rendon v. Valleycrest Prod., Ltd.,* 294 F.3d 1279 (11th Cir. 2002).

95. The actions by the Defendant violate:

   **a)** 42 U.S.C. § 12182(a), because Defendant's actions deny Plaintiff full and equal enjoyment of Defendant's goods and services;

   **b)** 42 U.S.C. § 12182(b)(1)(A)(i), because Defendant's actions deny Plaintiff equal participation in goods and services offered by the Defendant;

   **c)** 42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiff is provided both separate and unequal benefits of Defendant's goods and services;

   **d)** 42 U.S.C. § 12182(b)(1)(B), because Defendant does not

provide its goods and services in the most integrated setting appropriate;

e) 28 C.F.R. 36.303(c), because Defendant has failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiff.

96. Plaintiff does not allege that there is a particular set of mandatory regulations for websites that establish compliance or non-compliance as a matter of law. Plaintiff pleads, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, Defendant should rely upon the User Agent Accessibility Guidelines ("UAGG") 1.0, the Authorizing Tool Accessibility Guidelines ("ATAG") 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

97. To date, Defendant's discriminating actions continue.

98. As pled above, Defendant is the "owner" of the public internet website www.earthboundtrading.com and "operates" the world-wide website services that are available to the public at Earthbound Trading Co.

Therefore, it is responsible for its website.

99. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

100. This Court is authorized to enjoin these illegal actions by the Defendant. 42 U.S.C. § 12188.

## COUNT SIX
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, TITLE III
### *(Failure to Provide Mobile Application Accessibility)*

101. Plaintiff realleges and reincorporates paragraphs 1 through 100 as fully stated herein.

102. The ADA was the most sweeping civil rights legislation since the Civil Rights Act of 1964. When it was enacted, Congress had no conception of how the Internet would change global commerce. "[W]e were not communicating by e-mail, blog, or tweet; we were not filling virtual shopping carts with clothes, books, music, and food; we weren't banking, renewing our driver's licenses, paying taxes or registering for and taking classes online. Congress could not have foreseen these advances in technology. Despite Congress' great cognitive powers, it could not have foreseen these advances in technology which are now an

integral part of our daily lives. Yet Congress understood that the world around us would change and believed that the nondiscrimination mandate contained in the ADA should be broad and flexible enough to keep pace." Achieving the Promises of the Americans with Disabilities Act in the Digital Age—Current Issues, Challenges and Opportunities: Hearing before the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the House Comm. on the Judiciary, 111th Cong., 2d Sess. 111–95 (2010).

103.    Since the internet plays such a critical role in the personal and commercial lives of the Americans, excluding disabled persons from access to covered entities that use the internet and mobile applications as a means of reaching the public would defeat the purpose of this important civil rights legislation. In today's society, places of public accommodation are increasingly using mobile applications ("mobile apps") to provide services, benefits and goods more effectively to the public and expand the services the public accommodation has to offer in new ways. These services that are provided via a public accommodation for web applications, mobile application, and hybrid applications ("mobile platform") also need to be provided to disabled individuals.

104.    ADA Title III states that discrimination includes "a failure to take such

steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(iii). Regulations promulgated by DOJ implementing Title III require public accommodations to provide "appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Auxiliary aids and services include . . . *accessible electronic and information technology*, among other methods.  28 C.F.R. § 36.303(b) (emphasis added). Auxiliary aids and services also include acquisition or modification of equipment or devices, and other similar services and actions. 28 C.F.R. 36.303(b)(3)-(4).

105.   The plain language of these statutory provisions applies to discrimination in offering the goods and services "of" a place of public accommodation or the services, programs, and activities "of" a public entity, rather than being limited to those goods and services provided ''at'' or ''in'' a place of public accommodation or facility of a public entity.

**106.**     The ADA and the Title III regulation, since their enactment and promulgation, have always required that public accommodations provide effective communication to persons with disabilities through the provision of auxiliary aids and services. A commercial transaction between a customer and a public accommodation requires communication between the two. Defendant has chosen to provide a service through a mobile application to locate Earthbound Trading Co.'s stores; to learn more about the Defendant; to browse their "endless options" of merchandise; to purchase clothing, accessories, home décor, canvas art, jewelry; to "inspire curiosity" by sending a gift card; to enjoy rewards and discount programs; to access information regarding refunds and exchanges, among many other services through the mobile platform. The Defendant communicates all of that to able-bodied individuals as a service. Yet, Defendant's use of its mobile application and the services it offers through the application do *not* communicate and provide services to the disabled individuals. This is contrary to the broad mandate of the ADA, which prohibits not only outright exclusion, but also unnecessary differential treatment. *See* 42 U.S.C. §§ 12182(a), (b)(1)(A), (b)(2)(A)(iii). Congress expressly stated when passing the ADA, "…*the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep*

*pace with the rapidly changing technology of the times[,]"* and that technological advances *"may require public accommodations to provide auxiliary aids and services in the future which today would not be required because they would be held to impose undue burdens on such entities*." *See* H.R. Rep. No. 485, pt. 2.

**107.**    The unlawful implementation of eligibility criteria in other contexts that are clearly covered by the Act is analogous to the Defendant's effective screening of Plaintiff from using its mobile app. For example, there is no question that the administration of admission testing by a private secondary school falls within the scope of Title III. *See* § 12189; 28 C.F.R. 36.309. There would be little question that the ADA would apply, and would be violated, if Defendant screened guests as they entered, sending home guests on the grounds that they were deaf or physically disabled or suffered from diabetes or any other disability. *See* 28 C.F.R. Pt. 36 App. B, p. 640 (commentary to 28 C.F.R. 36.301) ("*It would violate this section to establish exclusive or segregative eligibility criteria that would bar, for example, all persons who are deaf from playing on a golf course or all individuals with cerebral palsy from attending a movie theater*") (emphasis added). Moreover, *"[a]n insurance company can no more refuse to sell a policy to a disabled person over the Internet than a furniture store can refuse to sell*

*furniture to a disabled person who enters the store'. Accordingly, the site of the sale is irrelevant. All that matters is whether the good or service is offered to the public. Nat'l Fed'n of the Blind. Scribd Inc.*, 97 F. Supp. 3d 565, 570 (D. Vt. 2015) (emphasis added). The Defendant's failure to permit or include assistive technology in relation to its mobile app directly and physically screens and prevents the Plaintiff from being able to use the mobile app, just as if Defendant in its stores placed items outside the Plaintiff's reach and said Plaintiff cannot have the items unless Plaintiff can get the items himself.

108.    In our contemporary technological society, "excluding businesses that sell services through the Internet from the ADA would 'run afoul of the purposes of the ADA and would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges, and advantages available indiscriminately to other members of the general public." *Nat'l Assoc. of the Deaf v. Netflix,* 869 F. Supp. 2d 196, 200 (D. Mass. 2012) (quoting *Carparts Distrib. Ctr. v. Auto. Wholesaler's Assoc.,* 37 F.3d 12, 20 (1st Cir. 1994).

109.    Defendant diminishes Plaintiff's rights under the ADA to fully participate in all aspects of society, which is counter to Congress' goal. Defendant's ableism, as described throughout the Complaint, is excluding

Plaintiff from equality of opportunity, full participation, independent living, and economic self-sufficiency and in doing so excludes Plaintiff from a plethora of goods and services that are offered through the mobile platform which includes but is not limited to the following:

a) Defendant is excluding, denying services, and otherwise segregating Plaintiff from all of the benefits and services Defendant offers through its mobile apps as a result of its failure to modify its mobile application platform to allow assistive technology, which includes, but is not limited to, voice recognition, alternative input methods, assistive touch functions, among other accessibility methods that Plaintiff requires, to compete on an equal basis and maintain independent self-sufficiency;

b) Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from Defendant's services that enable individuals to locate the nearest Earthbound Trading Co. store through the mobile apps;

c) Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able-bodied individuals,

disabled individuals are excluded from Defendant's services that enable individuals to register their email address or social media accounts to receive rewards and discounts through the mobile apps;

d) Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able-bodied individuals, disabled individuals are excluded from Defendant's services that enable individuals to establish a rewards account and enjoy the benefits which include but are not limited to (1) view rewards and other exclusive offers, (2) move through the checkout process faster, (3) store multiple shipping addresses; (4) view and track the online orders in the account, among other features through the mobile apps;

e) Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able bodied individuals, disabled individuals are excluded from Defendant's services that enable individuals to access and view all of the benefits of Earthbound Trading Co. in addition to communicating with a store representative through the mobile chat through the use of the mobile apps;

75

**f)** Defendant is excluding, denying services, or otherwise segregating Plaintiff, because unlike able-bodied individuals, disabled individuals are excluded from Defendant's services that enable individuals to access and view all of the benefits of Earthbound Trading Co. in addition to receive the benefits itself of the rewards and discounts program through the mobile apps;

**g)** Defendant is excluding, denying services, and otherwise segregating Plaintiff as a result of its failure to modify equipment, devices and other similar services. 28 C.F.R. § 36.303(b)(3)—(4).

**h)** Defendant is excluding, denying services, or otherwise segregating Plaintiff of all the goods and services offered on its mobile apps as a result of Defendant's failure to design its mobile apps that enable alternative assistive technology.

**110.** The design of Defendant's mobile app impedes Plaintiff and others similarly situated from accessing the services, privileges and accommodations afforded patrons through the mobile app. The mobile app fails to integrate alternative access methods that allow a person with limited manual dexterity in their hands to access the information and navigate the mobile app. Specifically, the applications of the website do not provide

voice or keyboard control, which denies Mr. Dunn, because his limited dexterity in his hands prohibits him from using the mouse-based controls for the applications.

111.    The actions by the Defendant violate:

    **a)**  42 U.S.C. § 12182(a), because its actions deny Plaintiff full and equal enjoyment of Defendant's goods and services;

    **b)**  42 U.S.C. § 12182(b)(1)(A)(i), because Defendant's actions deny Plaintiff equal participation in goods and services offered by the Defendant;

    **c)**  42 U.S.C. § 12182(b)(1)(A)(ii) and (iii), because Plaintiff is provided both separate and unequal benefits of Defendant's goods and services;

    **d)**  42 U.S.C. § 12182(b)(1)(B), because Defendant does not provide its goods and services in the most integrated setting appropriate;

    **e)**  28 C.F.R. § 36.303(c), because Defendant has failed to provide auxiliary aids and services where necessary to ensure effective communication with the disabled Plaintiff.

112.    Plaintiff does not allege that there is a particular set of mandatory regulations for websites that establish compliance or non-compliance as a

matter of law. Plaintiff pleads, consistent with the Department of Justice determinations, that in achieving such conformance and usability of websites by individuals with disabilities, Defendant should rely upon the UAGG 1.0, the ATAG 2.0, and the Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies ("WCAH2ICT"), published by the W3C, as well as guidance published by the W3C's Mobile Accessibility Task Force, as stated guidance published by the W3C's Mobile Accessibility Task Force.

113. To date, the Defendant's discriminating actions continue.

114. As pled above, Earthbound Trading Co. "owns" the Earthbound Trading Co. mobile application and its goods and services offered on the mobile app, and is, therefore, responsible for creating, implementing, and maintaining policies, practices and procedures pursuant to 42 U.S.C. § 12182.

115. Plaintiff has been obligated to retain the undersigned counsel for the filing and prosecution of this action. He is entitled to have his reasonable attorney's fees, costs and expenses paid by the Defendant pursuant to 42 U.S.C. § 12205.

116. This Court is authorized to enjoin these illegal actions by the Defendant. 42 U.S.C. § 12188.

**WHEREFORE**, based on the foregoing, Plaintiff, Patrick Dunn, demands judgment against the Defendant on Counts One through Six and requests the following injunctive and declaratory relief:

(1) That the Court declares that the leased properties and operated businesses by the Defendant as well as all Defendant's illegal actions described herein violate the ADA, as more particularly described above;

(2) That the Court enters an Order enjoining the Defendant to alter the facilities described above to make them accessible to and usable by individuals with disabilities to the full extent required by Title III of the ADA, to comply with 42 U.S.C. § 12182(b)(2)(A)(iv) and (v) and implementing regulations, as stated in Count One;

(3) That the Court enters an Order, in accordance with Count Two, directing the Defendant to modify its policies, practices, and procedures both to remedy the numerous ADA violations outlined above, in violation of 42 U.S.C. § 12182(b)(2)(A)(ii), and to permanently enjoin Defendant to make its business practices consistent with ADA Title III in the future;

(4) That the Court enters an Order directing the Defendant to provide Plaintiff full and equal access both to the Earthbound Trading Co. experience and to the use of the Defendant's retail stores, and further order Defendant to maintain the required accessible features at the retail

stores in the locations described above so that Plaintiff and others similarly situated are offered the experience that is offered to non-disabled individuals, as stated in Count Three;

**(5)** That the Court enters an Order directing the Defendant to evaluate and neutralize its policies, practices, and procedures towards persons with disabilities for such reasonable time so as to allow them to undertake and complete corrective procedures;

**(6)** That the Court enjoins Defendant to remediate the Earthbound Trading Co. retail stores in both Destin and Pensacola Locations to the proper level of accessibility required for the design and construction of the facilities for first occupancy, as stated in Count Four;

**(7)** That the Court enters an Order requiring that Defendant adopts and implements a website accessibility policy and take the necessary actions to make its website and website applications accessible to the Plaintiff, as particularly described in Count Five and Six;

**(8)** That the Court enters an Order requiring Defendant to place on its homepage a statement concerning its website accessibility policy; provide training to all its workers and associates who write or develop programs or code; and test its website quarterly to identify and repair any incidence of nonconformance;

**(9)** That the Court enters an Order requiring Defendant to adopt and implement a mobile application accessibility policy and take the necessary actions to make its mobile application accessible to the Plaintiff, as particularly described in Count Six;

**(10)** That the Court enters an Order requiring Defendant to place on its mobile application a statement covering its mobile application accessibility policy; provide training to all its workers and associates who write or develop the programs and code for the mobile application; and test the mobile application quarterly to identify and repair any indication of non-conformance;

**(11)** That the Court awards reasonable attorney's fees, costs, (including expert fees) and other expenses of suit, to Plaintiff;

**(12)** That the Court awards such other, further, and different relief to Plaintiff as this Court deems necessary, just, and proper.

*The remainder of this page is intentionally left blank.*

Respectfully Submitted this 10th day of January by:

*/s/ Anna Zhuromskaya*
ANNA ZHUROMSKAYA, ESQ.
Attorney for Plaintiff
FLA. BAR NO. 118016
The ADA Group, LLC
4001 Carmichael Road, Suite 570
Montgomery, AL 36106
334.819.4030 p.
334.521.3859 fax.
az@ada-firm.com